# EXHIBIT 1

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**ELLISDALE CONSTRUCTION, LLC**

# TABLE OF CONTENTS
## AMENDED AND RESTRICTED OPERATING AGREEMENT
## OF
## ELLISDALE CONSTRUCTION, LLC

**ARTICLE I FORMATION AND TERM**................................................................................................**1**
1.01     Formation and Background. ........................................................................................1
1.02     Term. .............................................................................................................................1

**ARTICLE II NAME, OFFICE OF THE COMPANY AND REGISTERED AGENT**.......................**1**
2.01     Name. .............................................................................................................................1
2.02     Offices of the Company. ...............................................................................................2
2.03     Registered Agent. .........................................................................................................2

**ARTICLE III BUSINESS OF THE COMPANY** .................................................................................**2**

**ARTICLE IV MEMBERS, INTERESTS AND CAPITAL** ..................................................................**2**
4.01     Members, Admission and Percentage Interests. .......................................................2
4.02     Initial Capital Contributions. ....................................................................................2
4.03     No Additional Capital Contributions. .......................................................................2
4.04     Guaranty of Company Indebtedness. .........................................................................3
4.05     No Third Party Beneficiaries. ....................................................................................4
4.06     Additional Provisions on Capital and Contributions. .............................................4

**ARTICLE V DISTRIBUTIONS AND ALLOCATIONS**......................................................................**5**
5.01     Distributable Cash. ......................................................................................................5
5.02     Net Income, Net Loss and Tax Credits. .....................................................................5
5.03     Tax Withholding. ..........................................................................................................5

**ARTICLE VI BOARD OF MANAGERS** .............................................................................................**5**
6.01     Power and Authority of the Board of Managers. .....................................................5
6.02     The Board of Managers. ..............................................................................................5
6.03     Removal of Managers and Vacancies. .......................................................................6
6.04     Meetings of Managers; Votes. .....................................................................................6
6.05     Presumption of Assent. ...............................................................................................6
6.06     Duties of Managers and Members. .............................................................................6
6.07     Third Party Reliance. ...................................................................................................6
6.08     Transactions with Manager and Affiliates. ..............................................................7
6.09     Limitations on Authority ............................................................................................7
6.10     Officers and Agents. .....................................................................................................7
6.11     Life Insurance. .............................................................................................................8

**ARTICLE VII INDEMNIFICATION** ...................................................................................................**8**

**ARTICLE VIII ACTION BY THE MEMBERS** ...................................................................................**9**
8.01     No Participation in Management. ...............................................................................9
8.02     Member Meetings. ........................................................................................................9
8.03     Member Voting and Consents. ....................................................................................9
8.04     Extraordinary Matters. ..............................................................................................10

ARTICLE IX  SUBCHAPTER S ELECTION ........................................................................ 10
  9.01   Subchapter S Election. ........................................................................... 10
  9.02   Invalid Transfer. ..................................................................................... 10
  9.03   S Election Corrections. ........................................................................... 10
  9.04   Section 338(h)(10) Elections. ................................................................. 11
  9.05   Pro rata Distributions and Allocations. ................................................ 11


ARTICLE X  REPRESENTATIONS OF MEMBERS ........................................................ 11


ARTICLE XI TRANSFER OF OWNERSHIP INTERESTS ............................................ 12
  11.01  Limitations. ............................................................................................. 12
  11.02  Right of First Opportunity. ................................................................... 14
  11.03  Substituted Members. ............................................................................ 14
  11.04  Reasons for Restrictions. ...................................................................... 15


ARTICLE XII  ADMISSION AND WITHDRAWAL OF MEMBERS .............................. 16
  12.01  Admission. .............................................................................................. 16
  12.02  No Right to Withdraw. ........................................................................... 16
  12.03  Withdrawal Event and Withdrawing Member. ..................................... 16


ARTICLE XIII DISSOLUTION AND TERMINATION .................................................. 17
  13.01  Dissolution. ............................................................................................ 17
  13.02  Winding Up Company Affairs; Final Distributions. ............................ 17


ARTICLE XIV  ACCOUNTS, BOOKS, RECORDS, ACCOUNTING, REPORTS, AND TAX MATTERS .. 18
  14.01  Bank Accounts. ...................................................................................... 18
  14.02  Books and Records. ............................................................................... 18
  14.03  Tax Information. ..................................................................................... 19
  14.04  Tax Matters Partner. ............................................................................ 19


ARTICLE XV  APPOINTMENT OF MANAGERS AS ATTORNEYS-IN-FACT ........... 19
  15.01  Appointment of Attorney-In-Fact. ....................................................... 19
  15.02  Duration. ................................................................................................ 19


ARTICLE XVI  AMENDMENTS ..................................................................................... 20


ARTICLE XVII  MISCELLANEOUS PROVISIONS....................................................... 20
  17.01  Governing Law. ...................................................................................... 20
  17.02  Captions. ................................................................................................ 20
  17.03  Construction. ......................................................................................... 20
  17.04  Survival of Representations and Warranties. ...................................... 20
  17.05  Severability. ........................................................................................... 20
  17.06  Nonwaiver. ............................................................................................. 20
  17.07  Confidentiality. ...................................................................................... 20
  17.08  Waiver of Partition. .............................................................................. 21
  17.09  Interests as Personal Property. ............................................................ 21
  17.10  Title to Company Property. ................................................................... 21
  17.11  Execution and Counterparts. ................................................................ 21
  17.12  Entire Agreement. ................................................................................. 21
  17.13  Attorneys' Fees. ..................................................................................... 21
  17.14  Addresses. ............................................................................................. 21

17.15   Notices. ................................................................................................................................21
17.16   Additional Documents and Acts. ..........................................................................................22
17.17   Reliance on Authority of Person Signing Agreement. .........................................................22
17.18   Independent Counsel. ...........................................................................................................22
17.19   Waiver of Jury Trial. ............................................................................................................22
17.20   Burdens and Benefits. ..........................................................................................................22

EXHIBIT A ..............................................................................................................................................1

EXHIBIT B ..............................................................................................................................................1

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## ELLISDALE CONSTRUCTION, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (together with all Exhibits, the "Agreement") of EllisDale Construction, LLC, a Maryland limited liability company (the "Company"), is made effective as of January 1, 2010, by and between its Members, whose names are set forth on Exhibit A attached to this Agreement, in order to set forth the terms and conditions on which the Company's management, business and financial affairs will be conducted.

NOW, THEREFORE, in consideration of the above premises and of the benefits to be obtained by the observance of the mutual covenants contained in this Agreement, and for other good, valuable and legal consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, agree as follows:

### ARTICLE I
### FORMATION AND TERM

1.01 **Formation and Background**. The Company was formed as "Ellis Denning Construction LLC" pursuant to Articles of Organization filed with the Maryland State Department of Assessments and Taxation ("SDAT") effective as October 8, 2004. The Company's initial operating agreement was an agreement dated January 1, 2005 as amended, whereby the Company began its existence as a limited liability company taxed as a partnership. Effective January 1, 2007, the Company elected to be treated as a corporation that elected Subchapter S tax status. Since the effective date of the Company's S election, the Company has operated consistently with the Subchapter S tax rules, and now wishes to memorialize their practice and Subchapter S structure in this Amended and Restated Operating Agreement. Further, the Members hereby expressly approve and authorize the filing with SDAT of LLC Amended and Restated Articles of Organization updating the name of the LLC and confirming that it is a manager-managed limited liability company. The Members wish to update the Company's operating agreement as a result of these events, such that this Agreement supersedes all prior operating agreements with respect to the Company and its Affiliates. The Members' rights and liabilities will be as provided in the Act, except as otherwise provided by this Agreement.

1.02 **Term**. The Company commenced as of its effective date of organization and will continue perpetually, unless sooner terminated in accordance with this Agreement.

### ARTICLE II
### NAME, OFFICE OF THE COMPANY AND REGISTERED AGENT

2.01 **Name**. The Company's name is EllisDale Construction, LLC. The Board of Managers, in its reasonable discretion and upon prior notice to all Members, may change the Company's name at any time. The Company's business may be conducted under such trade or fictitious names as the Board of Managers may determine.

2.02    **Offices of the Company**.  The Company's principal place of business and the specified office of the Company at which will be kept the records required to be maintained by the Company under the Act will be 1300 Piccard Drive, Suite 106, Rockville, Maryland 20850 or such other place or places as the Board of Managers will deem advisable.  The Company may have additional offices as the Board of Managers from time to time will deem advisable.

2.03    **Registered Agent**.  The Board of Managers will designate, where required, a registered agent and office in each state in which the Company transacts business.  The Company's agent for service of process in the State of Maryland will be as indicated in the Company's Articles of Organization, or such other qualified Person as the Board of Managers may designate.

**ARTICLE III**
**BUSINESS OF THE COMPANY**

The purposes for which the Company is formed are as follows:  (1) to engage in and carry on the business of constructing and erecting or contracting for the construction and erection of buildings and structures in and on such lands for any uses or purposes, constructing improvements upon dwellings and any other buildings and improvements on real estate, and providing construction management services; (2) to have and exercise all powers now or hereafter conferred by the laws of the State of Maryland on limited liability companies formed pursuant to the Act; and (3) to do any and all things necessary, convenient or incidental to the achievement of the foregoing.

**ARTICLE IV**
**MEMBERS, INTERESTS AND CAPITAL**

4.01    **Members, Admission and Percentage Interests**.  Each of the Persons listed on the Ownership Schedule, attached as Exhibit A, is a current Member of the Company, and has as of the date of this Agreement the Percentage Interests listed on such Ownership Schedule.

4.02    **Initial Capital Contributions**.  The Members have contributed, assigned and transferred to the Company in exchange for the Company issuing to them their Membership Interests, the amount of cash or item(s) of Property or services, as the case may be, as set forth on the Company's books and records.  Whenever a Member contributes property to the Company, he or she will provide to the Company the property's tax basis, and the current fair market value will be agreed upon by the Company and such Member.  Upon the execution of this Agreement by the Members, the Board of Managers will prepare an Ownership Schedule, which will be maintained with the Company's books and records, be updated by the Board of Managers without the necessity of amending this Agreement when there is a change in any information set forth on such Ownership Schedule, and be available to all Members upon request.

4.03    **No Additional Capital Contributions**.

(a)    The Board of Managers will endeavor to obtain a loan or loans for the Company, from time to time, for necessary capital on reasonable terms, in order to finance the ownership, improvement, management and operation of the Business, the rental and/or purchase and

- 2 -

improvement of any Property to be used in connection with the Business, or to otherwise refinance outstanding Company indebtedness.

(b)     No Member will be required to contribute any additional Capital Contributions to the Company.

4.04     **Guaranty of Company Indebtedness**.

(a)     A Member will not be obligated to guarantee Company indebtedness or other contractual obligations unless he or she agrees to do so. If, however, with the consent of the Board of Managers, a Member guarantees any debt or other contractual obligations of the Company ("Guaranteed Debt") and is subsequently called upon by the creditor holding such Guaranteed Debt to pay on his or her guarantee (which Member will be referred to below as a "Paying Member"), in whole or in part, the Paying Member (whether or not such Paying Member remains a Member) will be entitled to indemnification and a right of contribution from all the other Members for the amount by which the portion of the Guaranteed Debt the Paying Member actually pays exceeds his or her share of the Guaranteed Debt. A Person's share of the Guaranteed Debt will be determined by multiplying (i) the Percentage Interests then held by such Person (or if less than all Members contribute to the payment, then the Paying Member's Percentage Interest as compared to the aggregate Percentage Interests so contributing) by (ii) the amount of Guaranteed Debt then being paid out of the personal funds of all Members.

(b)     Any and all non-Paying Members ("Indemnifying Members") will, within 30 days of the Paying Member's demand therefor, indemnify and reimburse any Paying Member who has paid more than his or her respective share of Guaranteed Debt, such amount(s) as will cause each of the Paying Members and the Indemnifying Members to bear his or her respective share of the Guaranteed Debt. If any Indemnifying Member will default in his or her obligation to indemnify the Paying Member, then the Paying Member will be entitled to additional indemnification from the nondefaulting Indemnifying Members, within 15 days of the Paying Member's demand therefor, such that the Paying Member and the nondefaulting Indemnifying Members will share the burden of paying the Guaranteed Debt in amounts proportionate to their respective Percentage Interests (whereupon the still nondefaulting Indemnifying Members will also be considered Paying Members entitled to indemnification hereunder).

(c)     The Paying Member(s), *pari passu*, will have a continuing lien and security interest against the Membership Interest(s) of the defaulting Indemnifying Member(s) to secure the payment of the indemnification provided hereunder. The defaulting Indemnifying Member(s) will execute and deliver to the Paying Member(s) such instruments, including security agreements and financing statements, as any Paying Member deems necessary or appropriate to create and perfect such lien and security interest, and the defaulting Indemnifying Member(s) will pay all reasonable attorneys' fees in connection with preparation and filing of such instruments. Each Member irrevocably appoints the Paying Member(s), any one or more of whom may act, as his or her attorney-in-fact to execute, deliver and file any instruments, including security agreements and financing statements, as may be necessary or appropriate, in their discretion, to create and perfect the lien and security interest intended to be created subject to the provisions of this Section 4.04. This

power of attorney will be deemed coupled with an interest and will not terminate upon the death, dissolution, Bankruptcy, or disability of the defaulting Indemnifying Member.

(d) If any defaulting Indemnifying Member does not cure his or her default under this Section 4.04 immediately upon demand by the Paying Member(s), the Paying Member(s) will be entitled to exercise all the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in the Commonwealth of Virginia and otherwise treat the defaulting Indemnifying Member as a Defaulting Member. Interest will accrue on the amount in default at the rate of 4% plus the Prime Rate in effect from time to time (but not higher than the maximum rate legally permitted). All distributions otherwise payable to defaulting Indemnifying Members while any indemnification owed to a Paying Member remains unpaid will be distributed to each Paying Member in the proportion that the unpaid amount of indemnification owed to such Paying Member bears to the total unpaid amount of indemnification owed to all Paying Members, and will be applied first to the payment of interest and then to the payment of principal. Except to the extent otherwise provided by law, for so long as he or she is a defaulting Indemnifying Member, (1) a defaulting Indemnifying Member will not be entitled to vote any of his or her Percentage Interests or to exercise any other consent or approval rights reserved to Members under this Agreement, (2) any Company action may be taken without the consent or approval of the defaulting Indemnifying Member, and (3) his or her Percentage Interests will be disregarded in determining whether the requisite consent has been obtained on any Company matters.

4.05    **No Third Party Beneficiaries**.  In accordance with the Maryland Act, the provisions of this Agreement relating to the financial obligations of Members (including but not limited to this Article IV) are not intended to be for the benefit of any creditor or other Person (except for Members) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members; and, except for Members, no creditor or other person will obtain any right under any of such provisions or will by reason of any of such provisions make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any of the Members.

4.06    **Additional Provisions on Capital and Contributions**.

(a) In accordance with the Act, no Member or Assignee will be paid interest on his or her Capital Contributions.

(b) In accordance with the Act, no Member or Assignee will have the right to demand and receive property other than cash in return of his or her Capital Contributions.

(c) In accordance with the Act, except as otherwise provided in this Agreement, no Member or Assignee will have the right to demand or receive cash or other property of the Company in return of his or her Capital Contributions until the proper termination and a complete winding up of the Company as described in Section 13.02 of this Agreement.

(d) In accordance with the Act, the liability of any Member or Assignee for the losses, debts, liabilities and obligations of the Company will be limited to paying his or her Capital Contributions and/or indemnification when due under this Agreement, his or her share of any

undistributed assets of the Company, and (only to the extent required by the Act) any amounts previously distributed to him or her from the Company.

## ARTICLE V
## DISTRIBUTIONS AND ALLOCATIONS

5.01     **Distributable Cash.**  At any time during which the Company has only one Member, Distributable Cash will be distributed to such Member and any Assignee.  When there is more than one Member of the Company, then Distributable Cash will be distributed at least annually, among the Members and any Assignees pro rata in accordance with their respective residual Percentage Interests.  The Members intend that all Members and any Assignees share the economic benefits of the Company on that pro rate basis (regardless of voting rights).

5.02     **Net Income, Net Loss and Tax Credits**.  All Net Income and Net Loss will be allocated among the Members and any Assignees on a pro rata basis in proportion to their respective Percentage Interests.

5.03     **Tax Withholding**.  Each Member and Assignee authorizes the Company to withhold and pay over any withholding or other taxes (federal, state and local) payable by the Company as a result of such Person's status as a Member or Assignee.  To the extent the activities of the Company may subject it and/or its Members to state and local taxation, the Board of Managers are authorized (but not required) to file, deposit and pay taxes attributable to the Company's activities in a state or other jurisdiction on behalf of the Members and Assignees, and withhold that amount from other distributions to such Members and Assignees.  To the extent such taxes are paid by the Company, but are not withheld from a distribution made to a Member or Assignee, then such Member or Assignee will be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or taxes are paid by the Company, which payment will be considered a loan from the Company to that Member or Assignee.  Such loan will bear interest at the Prime Rate and will be repayable on demand, or at the election of the Company discharged out of other distributions to which the Member or Assignee otherwise would be entitled.  The provisions of this Section will survive the dissolution, winding up and termination of the Company.

## ARTICLE VI
## BOARD OF MANAGERS

6.01     **Power and Authority of the Board of Managers**.  Except as otherwise expressly limited in this Agreement, the Board of Managers will (i) exercise complete and exclusive control of the management of the Company's Business and affairs and (ii) have the exclusive right, power and authority on behalf of the Company, and in its name, to exercise all of the rights, powers and authorities of the Company under the Act.  Each Manager will discharge his or her duties as a manager in accordance with the standards of conduct set forth in the Act and be a fiduciary with respect to the Company.

6.02     **The Board of Managers**.  The Board of Managers will be composed of Managers, the current Managers being Kevin D. Ash and Richard E. Ward, II (in such capacity, the "managers"

pursuant to the Act). A Manager may, but will not be required to, be a Member. The term of any Manager will begin at his or her election, and will continue until removed pursuant to Section 6.03.

6.03   **Removal of Managers and Vacancies**. A Manager may be removed by or as a result of (i) operation of law, (ii) an order or decree of any court of competent jurisdiction, (iii) voluntary resignation, (iv) the death, dissolution, or Bankruptcy of the Manager, (v) in the case of a Manager who is also a Member, a Withdrawal Event with respect to such Manager, or (vi) by vote or written consent of Members holding at least 66⅔% of the outstanding Percentage Interests entitled to vote. A successor or additional Manager may be elected by the Members holding at least a Majority in Interest of Members.

6.04   **Meetings of Managers; Votes**. The Board of Managers will endeavor to meet at least quarterly. On each matter coming before the Board of Managers, each Manager will have one vote for each percent of Membership Interest that he or she (or his or her trust) may own in the Company, and if he or she (or his or her trust) does not own any Membership Interests then such Manager will have only one vote; such that those Managers who own more Membership Interests of the Company will have a greater weighted vote than Managers who own fewer or no Membership Interests of the Company. Any Manager not present at a meeting may vote on any matter by general or specific proxy and/or by power of attorney directed to a Manager present, or by specific instructions in writing. Except as otherwise provided in this Agreement, any action of the Board of Managers will be by majority vote of the Managers. Managers may have Board of Managers meetings from time to time upon such reasonable notice as mutually agreed upon by the Managers, and/or the Board of Managers may act informally without meetings upon the consent of a majority vote of Managers (except as otherwise provided in this Agreement).

6.05   **Presumption of Assent**. A Manager who is present at a meeting of the Board of Managers or a Committee of the Board of Managers when Company action is taken is deemed to have assented to the action taken unless (a) he or she objects at the beginning of the meeting, or promptly upon his or her arrival, to holding it or transacting specified business at the meeting; or (b) he or she votes against, or abstains from, the action taken. The Secretary or any other officer performing the Secretary's duties will maintain accurate records of all votes of the Board of Managers.

6.06   **Duties of Managers and Members.** The Managers will devote such time, effort and skill in the management of the Company's business affairs as each deems necessary and proper for the Company's welfare and success. The Members expressly recognize that the Managers and Members may have substantial other business activities and agree that the Managers will not be bound to devote all of their business time to the Company's affairs, and that the Managers, Members or their Affiliates may engage for their own account and for the account of others in other businesses or activities. Provided, however, it is expected that Kevin D. Ash is expected to devote substantially all of his full time attention to the business of the Company.

6.07   **Third Party Reliance**. Third parties dealing with the Company will be entitled to rely conclusively upon the power and authority of the Managers as set forth in this Agreement, subject only to the express limitations set forth in this Agreement or by law. The Managers may

from time to time execute certificates of authority attesting to this Agreement's full force and effect, the Manager's powers hereunder, and the incumbency of the Managers.

6.08    **Transactions with Manager and Affiliates**.  Subject to obtaining any consent expressly required under the terms of this Agreement, the Managers may appoint, employ, contract, or otherwise deal with any Person, including a Manager and Affiliates of a Manager, individuals with whom a Manager is related, and with Persons that have a financial interest in a Manager or in which a Manager has a financial interest, for transacting the Company's business; provided, however, these or other payments under the terms of contracts with such related parties will not be in excess of prevailing competitive rates for such transactions.

6.09    **Limitations on Authority**  Notwithstanding anything else in this Agreement to the contrary, without the express written determination by all Managers, an individual Member or Manager does not have any authority to:

(a)     purchase, sell, exchange or otherwise dispose of any real or personal property by the Company having a value (including a value on the books of the Company) in excess of $50,000;

(b)     obtain a loan on behalf of the Company in excess of $50,000 or refinance a loan on behalf of the Company in excess of its then balance plus the cost to refinance;

(c)     admit any Person as a Member;

(d)     dissolve or otherwise terminate the Company;

(e)     merge with one or more entities;

(f)     sell or transfer all or substantially all of the Company's assets other than in the ordinary course of business; or

(g)     issue any new Membership Interests under this Agreement.

6.10    **Officers and Agents**.

(a)     The Board of Managers may from time to time appoint officers and other agents of the Company with such authority and duties as may be prescribed from time to time by the Board of Managers. Any two or more offices may be held by the same person, and such officers and agents will serve at the pleasure of the Board of Managers. Kevin D. Ash ("Ash) is hereby appointed as the President/CEO of the Company with overall day-to-day authority to execute documents on behalf of the Company and to take such further action as may be determined from time to time by the Board of Managers. Subject to Section 6.09, the President will have authority to (i) enter into contracts with customers, subcontractors or suppliers; (ii) hire employees and agents of the Company for such reasonable compensation as he will determine; (iii) terminate employees and agents of the Company; and (iv) execute, acknowledge and deliver any and all instruments to effectuate the foregoing.

(b)     Ash will be employed on a full time basis by the Company and be reasonably compensated for his efforts on behalf of the Company.  His existing Employment Agreement and Employee Confidentiality, Assignment of Inventions and Non-Competition Agreement are terminated in their entirety and superseded by this Agreement. So long as the Company is taxed as an S Corporation, the Company will deduct applicable income and payroll taxes in accordance with

law. Ash will be entitled to participate in any retirement, 401(k), group medical, disability and other benefit plans, leave programs and other fringe benefits now existing or hereafter established from time to time by the Company.

6.11 **Life Insurance**. The Company is authorized and directed to purchase, own and maintain life insurance policy(s) on the life of Ash. Currently the Company owns, maintains and is the beneficiary of a term life insurance policy in the face amount of $1,000,000. That life insurance policy is deemed to be key person insurance that may be used by the Company for its working capital and other business needs. Any balance of such key person life insurance proceeds will be added to the Company's remaining net assets for distribution to Members and Assignees in dissolution and winding up of the Company pursuant to Section 13.02. The Company will also maintain (and/or alternatively pay the premiums for) a whole life insurance policy on Ash's life in the face amount of $1,000,000 and Ash's family, estate or designee will be the beneficiary of that policy. The Company and the Members agree to maintain all such insurance in full force and effect. The parties agree that the Company and its other Members have the right to take out insurance on Ash's life for purposes of this Agreement. The Company will cause to be paid all premiums on life insurance policies purchased pursuant to this Agreement as they become due and give proof of payment to Ash within 20 days after each premium's due date. If any premium on any policy is not paid by the Company or the other Members within 20 days after its due date, then Ash may pay the premium and be entitled to reimbursement from the Company and the other Members. Upon Ash's death, the Company and the surviving Member must promptly proceed to collect any net proceeds of such insurance on Ash's life that has been purchased or held pursuant to this Agreement. If Ash is no longer a Member of the Company during his life, he is entitled to cause the ownership and beneficiaries of these life insurance policies to be transferred to him or an Affiliate. The Company and the other Members agree to cooperate and execute all such instruments as may be necessary or appropriate to cause such a transfer. This Section 6.11 will also constitute written notice to Ash that the Company may insure his life and may insure it up to a maximum face amount of $2,000,000; and that the Company and the other Members will be the indirect beneficiary of Ash's death benefits under all such policies due into this Agreement. Ash's signature to this Agreement will constitute a written consent to being insured on such terms.

### ARTICLE VII
### INDEMNIFICATION

The Managers are agents of the Company in accordance with law, and owe fiduciary duties to the Company. The Company has the power in accordance with law to indemnify, defend and hold harmless any Person who was or is a party to any proceeding, including a proceeding brought by a Member in the right of the Company or brought by or on behalf of the Members of the Company, by reason of the fact that such Person is or was a Manager of the Company, or is or was serving at the request of the Company as a manager, director, trustee, partner or officer of another limited liability company, corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against any liability, judgment, fine, settlement payment, and reasonable expenses (including reasonable attorneys' fees) incurred by such Person in connection with such proceeding.

## ARTICLE VIII
## ACTION BY THE MEMBERS

8.01 **No Participation in Management**. Except as may be specifically provided in this Agreement, Members may not and will not participate in the management or control of the Company's affairs in any manner whatsoever, may not and will not have any right to obligate the Company in any way, and may not and will not have a right to receive Company assets other than allocations of income, gain and loss as required by tax law, and distributions in cash or property as provided herein; and the Members may not and will not have any other rights to vote, propose, or approve Company actions or otherwise except as expressly provided otherwise in this Agreement. Instead, this Agreement contemplates a representational form of governance, whereby Members elect Managers from time to time to manage the Company.

8.02 **Member Meetings**. Meetings of the Members will be held on the call of the Board of Managers or any Members holding not less than 10% of the outstanding Percentage Interests entitled to vote. These meetings may be to review the activities of the Company and obtain information regarding the Company from the Board of Managers. The meetings may also be called to elect and remove Managers and approve other matters regarding the Company which may require Membership approval. In accordance with the Maryland Act, there is no requirement for annual member meetings – rather, meetings may be called by the Members or the Board of Managers as appropriate in furtherance of Company Business. Written notice stating the place, day and time of every meeting of Members will be given personally, by mail or electronically not less than 5 nor more than 60 days before the date of the meeting to each Member entitled to vote at such meetings, at his or her address which appears on the records of the Company. Oral notice of a meeting is also effective when communicated, if communicated in a comprehensible manner. Further, meetings may be held at any time without notice if all of the Members are present, or those not present waive notice of the meeting.

8.03 **Member Voting and Consents**. Elsewhere in this Agreement, certain actions or activities require the express consent of a certain percentage of Membership Interests. Each Member will have 1 vote for each Percentage Interest (a fractional Percentage Interest will have a corresponding fractional vote) then held by him or her. In accordance with the Maryland Act, a Withdrawing Member and any Assignee do not have any voting rights until fully admitted to membership pursuant to Articles XI or XII of this Agreement. Such Member voting and consent may be taken at a meeting of Members (a meeting will include the use of communication by which all Members participating may simultaneously hear each other during the meeting). Alternatively, Member votes and consents may be taken without a meeting if the action is taken by a Majority in Interest of Members (or such higher vote as may be provided elsewhere in this Agreement in order for Members to take action). Such action without a meeting will be evidenced by one or more written consents to be filed with the Company's records. The action taken pursuant to a written consent is effective when the last consenting Member needed for an approval, signs the consent unless such consent specifies a different effective date, in which event the action taken is effective as of the date specified therein provided the consent states the date of execution for each consenting Member. A Member's consent to an action by electronic transmission is deemed a written and signed consent. In the event that any Member fails to respond within 30 days to a written notice

from the Board of Managers requesting a consent, such Member will conclusively be deemed to have consented to the proposed action.

8.04    **Extraordinary Matters**. Despite any provision to the contrary in this Agreement, the affirmative vote or written consent of Members holding at least 75% of the outstanding Percentage Interests entitled to vote will be necessary (and sufficient) for the Company to (a) be dissolved or terminated under the provisions of the Act; (b) merge with one or more domestic or foreign limited liability companies, limited partnerships or corporations under the applicable provisions of the Act; or (c) sell or transfer all or substantially all of the Company assets other than in the ordinary course of business.

## ARTICLE IX
## SUBCHAPTER S ELECTION

9.01    **Subchapter S Election**. The Company has "checked-the-box" to be treated as a corporation for tax purposes and has specifically filed an S election under the Code and applicable sate tax laws to be treated as an S corporation for tax purposes. The Company and the Members agree that, unless and until mutually agreed otherwise in a written instrument executed by the Company and Members holding at least 75% of the outstanding Percentage Interests entitled to vote, (a) the Company will continue to elect to be treated as an S corporation under the Code; and (b) the Members (for themselves and their heirs, beneficiaries and personal representatives) will not take any action or make any transfer or other Disposition of any Membership Interests that would directly or indirectly cause a termination of any Company S election. The Company and the Members agree to take all actions necessary, including but not limited to completion and execution of all required consents and filings, to establish and preserve the Company's status as an S corporation. Notwithstanding anything in this Agreement to the contrary, a Member may <u>not</u> transfer, and no person may acquire, the beneficial ownership of any Membership Interest if such transfer or acquisition would cause the termination of the Company's status as an S corporation.

9.02    **Invalid Transfer**. Any transfer or acquisition of Membership Interests in violation of this Article IX will be null and void and of no effect. Each Member agrees that any such attempt at transfer or acquisition may be enjoined. Any purported transfer in violation of this Agreement will not be recorded on the books and records of the Company and will not affect the beneficial ownership of the Membership Interests. Thus, a Member making the purported transfer will retain the right to receive distributions and liquidation proceeds despite any purported transfer in violation of this Agreement. Additionally, the Member making the purported transfer will continue to report the share of Net Income or Net Loss of the Company allocated to such Membership Interests on his federal and state income tax returns in accordance with the Code.

9.03    **S Election Corrections**. If the Company's S election is terminated because of any such Member's act or failure to act, then such Member will be liable to and hereby indemnifies, defends and holds harmless the Company and the other Members and the Assignees of Company for any damages, liabilities and costs resulting directly or indirectly therefrom, including without limitation any additional federal and state income tax liability which would not have been incurred had the S election continued in effect. All Members agree to fully cooperate with the Company in

seeking to correct a terminated S election.  A Member's obligations under this Article IX will continue after such Member has ceased to own any Membership Interests of the Company.

9.04    **Section 338(h)(10) Elections**.  If Members holding at least 75% of the outstanding Percentage Interests entitled to vote agree to make a Code Section 338(h)(10) election with respect to a sale of the Company's Membership Interests, then each Member agrees to execute such documents and take such steps to effectuate such an election.

9.05    **Pro rata Distributions and Allocations**.  Any and all distributions to Members and Assignees in their capacity as owners (i.e. not including compensation) will be pro rata among all Members and Assignees in their ratio of overall Percentage Interests in the Company.  To the extent any distributions are not pro rata, the recipients will promptly repay such non-pro rata amounts upon request by the Company.

## ARTICLE X
## REPRESENTATIONS OF MEMBERS

Each of the Members, in becoming admitted as a Member hereunder, hereby represents and warrants to the Managers and each other and to the Company that:

(a)    Such Member's acquisition of a Membership Interest in the Company is made as a principal for his or her sole account only and not with a view toward the distribution of all or any portion thereof and that under no circumstances will such Member sell, transfer or assign all or any portion of his or her Membership Interest except in compliance with the provisions of this Agreement;

(b)    Such Member is relying on his or her own business and financial knowledge and experience, or that of his or her duly qualified investment advisor, in making a decision to enter into and execute this Agreement; he or she, either alone or together with such investment advisor, has such knowledge and experience in business and financial matters as will enable him or her to evaluate the merits and risks of this venture, and to make an informed decision, and is able to bear the economic risk of his or her participation in the Company; and that such Member is not relying on the Company's advice or any affiliates in becoming a Member hereunder;

(c)    Such Member is aware of the restrictions on transfer of his or her Membership Interest hereunder, and that the same will at no time be freely transferable or be assignable otherwise than to a person accepting similar restrictions on transferability, and that no trading market for Membership Interests in the Company will exist at any time;

(d)    Such Member has adequate means of providing for current needs and possible personal contingencies, no need for liquidity of his or her Membership Interest, and no reason to anticipate any change in personal circumstances, financial or otherwise, which should cause him or her to sell or distribute, or necessitate or require any sale or distribution, of such Membership Interest;

(e)     Such Member is familiar with the nature of and risks attendant to investments in business, real estate and/or in securities, and has relied on no representations or warranties of the Company or its Managers or Members (or any of their affiliates) other than those set forth in this Agreement or otherwise delivered by the Company or its Managers in writing;

(f)     Such Member is fully aware of the restrictions on resale of his or her Membership Interest under this Agreement and under federal and state law (including any applicable securities law); in particular, he or she is aware that the Membership Interest will not at any time be freely saleable and that any sale thereof may have significant adverse tax consequences;

(g)     Such Member will not, in any event, sell or distribute his or her Membership Interest or any portion thereof unless, in the opinion of counsel, which opinion will be satisfactory to counsel for the Company, such Membership Interest may be legally sold or distributed;

(h)     Such Member is fully aware that the Membership Interests are being issued by the Company in reliance upon the exemption provided by Section 4(2) and/or 4(6) of the Securities Act of 1933 and/or Regulation D thereunder and applicable state laws on the grounds that no public offering is involved, and upon the representations, warranties and agreements set forth in this Article X;

(i)     Such Member has full power and complete authority to enter into this Agreement, form the Company and perform his or her obligations hereunder, without the need of any consent of others; and

(j)     Such Member will not, directly or indirectly, take any action or fail to take any action, which would terminate this limited liability company and/or cause the Company to not be taxed as a partnership.

## ARTICLE XI
## TRANSFER OF OWNERSHIP INTERESTS

11.01   **Limitations**.

(a)     In accordance with law, the ownership and transferability of interests in the Company are substantially restricted. No Member or Assignee may make or permit a Disposition of all or any part of his or her Membership Interest except as specifically set forth in this Agreement. Without limiting the foregoing, a Member may not pledge, grant a security interest in or otherwise encumber all or any part of his or her Membership Interests except as otherwise approved in writing by the Board of Managers. Any attempted Disposition not specifically authorized herein will be invalid, null and void *ab initio*.

(b)     A Person who has made a Disposition of all or any portion of his or her Membership Interests in accordance with the provisions of this Article XI will cease to have any right or entitlement to (i) share in the distributions of the Company in respect of such transferred Membership Interests, (ii) share in the tax allocations in respect of such transferred Membership Interests, or (iii) vote any purportedly transferred Membership Interests. In accordance with the Maryland Act, no Disposition will relieve or exculpate the transferring Member from any liabilities

or obligations under this Agreement until his or her Assignee is admitted as a substitute Member in accordance with Section 11.03. Further in accordance with the Maryland Act, unless and until an Assignee is admitted as a substitute Member in accordance with Section 11.03, the Assignee will not have any of the rights to participate in the management or affairs of the Company or exercise any rights of a full Member under the Act, and will only have the rights of an assignee under Section 4A-603 of the Act to share in the tax allocations and distributions to which the transferor Member would be entitled in respect of the transferred Membership Interests.

(c)     Unless otherwise permitted by a written authorization by the Board of Managers, no Person may make or permit a Disposition of all or any portion of his or her Membership Interests (or make or permit any filing, election or other action which could result in a deemed Disposition) in the following circumstances:

(i)     in the absence of an opinion of counsel, satisfactory to the Board of Managers, that the registration of the Membership Interests, or the Disposition thereof, is not required under the Securities Act of 1933, as amended, or any applicable state securities laws,

(ii)     unless his or her Assignee will agree in a writing acceptable to the Board of Managers to be bound by, and to take such transferred Membership Interests subject to, the obligations, conditions and restrictions hereunder as same applies to Members or their Membership Interests, or

(iii)     if there is a deed of trust, security agreement or other material contract to which the Company is a party or by which the Company or any of the Property is bound or subject, and pursuant thereto such Disposition entitles the holder of the indebtedness secured thereby or other contractual party to accelerate the indebtedness or terminate or otherwise materially alter the terms of the contract.
If there is a doubt as to ownership of a Membership Interest or who is entitled to Distributable Cash or liquidating proceeds or other Property, the Board of Managers may accumulate Distributable Cash or liquidation proceeds or other Property until the issue is resolved to the satisfaction of the Board of Managers.

(d)     In accordance with the Maryland Act, no Disposition of Membership Interests by an Assignee will entitle the transferee(s) to become a Member or to otherwise acquire membership rights unless such transferee(s) is/are admitted as a substituted Member under the provisions of Section 11.03.

(e)     Despite the foregoing provisions of this Section 11.01, upon the occurrence of a Withdrawal Event with respect to a Member, his or her Membership Interests will be held by his or her Assignee, as determined under applicable law, but subject to the terms, conditions and restrictions of this Agreement. Without limitation of the preceding sentence, the restrictions of Sections 11.01 – 11.05 and Section 12.04 will apply to any Assignee pursuant to a Disposition by reason of a Withdrawal Event to the same extent that, under the circumstances, such restrictions would have applied to the Withdrawing Member.

(f)     Notwithstanding anything in this Agreement to the contrary, any acquisitions of Membership Interests pursuant to the Purchase Agreements will be automatically substituted as a Member with respect to such assigned Membership Interests.

11.02  **Right of First Opportunity**.

(a)     (i)     If a Member wishes to sell or transfer all or any portion of his or her Membership Interests, he or she will, before making any such Disposition, first give the other Members (if any) a Selling Notice, specifying in writing the price, conditions and terms upon which he or she is willing to sell such Membership Interests.  The other Members will have the option to purchase in the aggregate all (but not less than all) of the offered Membership Interests at the price and upon the conditions and terms set forth in the Selling Notice in the manner described in Sections 11.02(a)(ii) and (iii).

(ii)     The other Members will have 45 days from the date of the Selling Notice within which to elect to purchase all of the offered Membership Interests.

(iii)     The option may be exercised by giving notice to the offering Member within the specified period.  If more than one Member among those eligible to elect desires to purchase, they may purchase the offered Membership Interests in proportion to their respective Membership Interests, unless they otherwise agree.  The closing of the purchase will be not more than 90 days from the date of the Selling Notice.  To the extent any Member purchases any of the offered Membership Interests, the purchasing Member(s) will likewise succeed to that same pro rata portion of the seller's Membership Interests.

(iv)     If the other Members fail to elect to purchase all of the offered Membership Interests, then the offering Member may, subject to the restrictions set forth in Section 11.01, sell the Membership Interests attributable to all such offered Membership Interests at a price not below nor upon terms more advantageous to the purchaser than those contained in the Selling Notice.  If the sale is not made and consummated within 120 days after the date of the Selling Notice, the offering Member may not thereafter sell or otherwise dispose of any of his or her Membership Interests without again complying with this Section 11.02.

(b)     Despite any provision herein to the contrary, a Member who suffers or otherwise experiences a Withdrawal Event will have no right to sell any of his or her Membership Interests under this Section 11.02.

11.03  **Substituted Members**.

(a)     Unless named in Exhibit A to this Agreement or admitted as provided in this Section 11.03 or Section 12.01, no Person will be considered a Member nor have any rights of Members.  Except as otherwise provided herein, the Company, each Member, and any other Person having business with the Company need deal only with Members so named or so admitted, and will not be required to deal with any other Person (including but not limited to any Assignee) by reason of any Disposition by a Member or by reason of a Withdrawal Event with respect to a Member.  Except as otherwise provided herein, in the absence of the admission of an Assignee as a substituted

Member in full or partial substitution for a Member who makes any Disposition of all or any portion of his or her Membership Interests, any payment to a Member or to his or her estate or personal representative in respect of Membership Interests transferred by him or her will acquit the Company of all liability to any other Person (including but not limited to any Assignee) who may be interested in such payment by reason of a Disposition by, or a Withdrawal Event of, such Member.

(b)     After a Disposition to an Assignee of all or any portion of a Member's Membership Interests (whether by reason of a Withdrawal Event or any other Disposition) at any time when there exists at least one other Member of the Company, then the Assignee may become a substituted Member in full or partial substitution for the transferor Member to the extent of the transferred Membership Interests, but in any case only if all of the following conditions are satisfied:

(i)     The requirements of Sections 11.01 and 11.02 will have been satisfied to the extent applicable under the circumstances;

(ii)     The transferor Member and Assignee will execute and deliver such other instruments as the Company may require, including written acceptance by the Assignee of the terms and conditions of this Agreement and to assume liability for all obligations of the transferor Member to the Company (including but not limited to loans resulting from distributions in excess of the transferor's Capital Account);

(iii)     Pursuant to the Maryland Act except as otherwise expressly provided herein, the affirmative unanimous vote or unanimous written consent to the full or partial substitution will have been obtained from the Board of Managers, which consent may be granted or withheld in the absolute discretion of each Manager; and

(iv)     The Assignee will have paid all reasonable fees and costs incurred by the Company in connection with his or her substitution as a Member, as determined by the Board of Managers.

11.04   **Reasons for Restrictions**.  This Company is formed by those who know and trust one another, who will have surrendered certain management rights (in exchange for limited liability in the case of a non-Manager Member), or who will have assumed management responsibility and risk (in the case of a Manager Member) based upon their relationship and trust.  Capital is material to the business and investment objectives of the Company and its federal tax status.  An unauthorized Disposition of a Person's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.  These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue.  Except as provided in this Agreement, neither record title nor beneficial ownership of any Membership Interest may be transferred without the unanimous written consent of all Members.

## ARTICLE XII
## ADMISSION AND WITHDRAWAL OF MEMBERS

12.01   **Admission.**

(a)     The Company may issue new Membership Interests directly to a new or existing Member upon the approval of the Board of Managers in accordance with Section 6.09. The issuance of new Membership Interests will be authorized based on the good faith determination that the consideration to be received therefor is adequate. Membership Interests may be issued in return for the contribution of cash, property, services rendered or a promissory note or other binding obligations to constitute cash or property or to perform services. If the cash or property is not received, the services are not performed, the benefits are not received, or the note is not paid, the Membership Interests may be canceled in whole or in part. Without limitation of the foregoing, the Company may grant to Persons options, warrants, and other rights to acquire a Membership Interest (and to become a Member upon the exercise thereof) on such terms and conditions as approved by the Board of Managers in accordance with Section 6.09. In addition, any issuance or award of Membership Interests may be subject to forfeiture, in whole or in part, upon the failure of any of the conditions or requirements that are stipulated in connection with the issuance or award of such Membership Interests.

(b)     The admission of a Member to the Company will be evidenced by a writing signed by an officer authorized by Board of Managers and the Member, and such writing will set forth (i) the Membership Interests to be acquired by such Member; (ii) the Capital Contribution to be furnished by the Member, and (iii) the Member's agreement to be bound by, and to take his or her Membership Interests subject to, the terms and conditions of this Agreement. Any such writing will be deemed to amend, and will be incorporated into, this Agreement.

12.02   **No Right to Withdraw.**   In accordance with the Maryland Act, no Member will have any right to voluntarily resign or otherwise withdraw or resign from the Company without a vote or the written consent of Members holding at least 75% of the outstanding Percentage Interests entitled to vote.

12.03   **Withdrawal Event and Withdrawing Member.**   A Withdrawing Member will cease to be a Member as of the effective date of the applicable Withdrawal Event and will thereafter be treated as an Assignee with respect to the Membership Interests then held by such Withdrawing Member. Such Withdrawing Member will not be released or discharged from any of the obligations of a Member under the provisions of this Agreement, unless provided otherwise in the written consent of Members holding at least 75% of the outstanding Percentage Interests entitled to vote. In accordance with the Maryland Act, such Withdrawing Member will have no entitlement to "put" his or her Membership Interests to the Company or to the other Members or otherwise to receive any payments or distributions in respect of his or her Membership Interests except as expressly provided in this Agreement. Such Withdrawing Member may be re-admitted to membership in the Company only upon satisfaction of the requirements set forth in Section 12.01. Despite anything in this Agreement to the contrary, upon a Withdrawal Event occurring to the last remaining Member of the Company, his or her Assignee is hereby automatically continued as a full Member without any further act or deed thereby succeeding to a full Membership Interest in the Company effective as of

the date of the Withdrawal Event and the Company's existence continued uninterrupted by operation of law.

12.04  **Dissolution on Withdrawal Event**.  Upon a Member's death or other Withdrawal Event, then the Company will dissolve and wind up its projects and affairs and close down, distributing any net assets in accordance with Section 13.02.  In such a case, the Company will wind up all projects that are under contract with the Company.  If a project is merely a prospect or in the discussion phase, pursuant to a letter or intent or otherwise not a binding contract, it will not be part of the winding up activities of the Company.  Each Member is thereupon free to start up a new company separately or with others.  No Member is subject to a non-compete or a non-solicit agreement with respect to the Company's activities.  If the Withdrawal Event is due to the death or disability of a Member, the surviving or remaining Member has the right to continue to use the name of the Company in use at the time of that Withdrawal Event.  The Members may also agree to let the remaining Members continue to use this Company (as long as all the existing projects are wound up and any net proceeds thereof are distributed in accordance with this Section 12.04).

### ARTICLE XIII
### DISSOLUTION AND TERMINATION

13.01  **Dissolution**.

(a)  The Company will be dissolved and its affairs wound up only upon the earlier of (i) the affirmative vote (or written consent) of the Members adopting such dissolution and winding up in accordance with Section 8.04; or (ii) the sale or other disposition of all or substantially all of the assets of the Company, but if in connection with such disposition, the Company receives a promissory note(s), the Company will continue until such promissory note(s) is satisfied, sold or otherwise disposed of; (iii) the entry of a decree of judicial dissolution under the Act, or (iv) a Withdrawal Event of a Member (as more particularly described in Section 12.04).

(b)  A Withdrawal Event with respect to any Member will not cause a dissolution or winding up of the Company except as otherwise authorized pursuant to Section 13.01(a).

13.02  **Winding Up Company Affairs; Final Distributions**.

(a)  Upon any dissolution of the Company, the Board of Managers will wind up the affairs of the Company.  A reasonable time as determined by the Board of Managers not to exceed 18 months will be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to the creditors so as to minimize any losses attendant upon dissolution.  The Board of Managers may sell or otherwise liquidate the Company's assets in *bona fide* sales on such prices and terms as it may determine, or it may distribute assets in kind.  After any dissolution and winding up of the Company, and the payment of, or the making of due provisions for, all debts and liabilities of the Company, then the Company's remaining assets (or the net proceeds of the sale thereof) will be distributed as follows:

(i)      If the Company had only one Member just before the dissolution of the Company, then all such net assets and proceeds will be distributed to such Member or his or her Assignee; or

(ii)      If the Company had more than one Member just before the dissolution of the Company, then all such net assets and proceeds will be distributed to the Members and Assignees in the order provided in Section 5.01.

If any assets are distributed in kind, they will be distributed on the basis of the fair market value thereof as determined in the same manner described in Section 12.04 and will be deemed to have been sold at fair market value for purposes of the allocations under Article V prior to making such distributions.

(b)      When all assets of the Company have been sold and/or distributed and all affairs of the Company have been wound up, the Managers will execute and file Articles of Cancellation with the SDAT (and any certificate or other document which may be appropriate to indicate it has wound up). Upon the issuance by the SDAT of a Certificate of Cancellation, the Company's existence will thereupon cease.

## ARTICLE XIV
## ACCOUNTS, BOOKS, RECORDS, ACCOUNTING, REPORTS, AND TAX MATTERS

14.01   **Bank Accounts**. The Company's funds will be deposited in the Company's name in such bank or financial accounts as may be designated by the Board of Managers, and the Board of Managers will arrange for the appropriate conduct of such accounts, including the signatures to be required.

14.02   **Books and Records**.

(a)      The Managers and officers will keep or cause to be kept (i) complete and accurate books of account in accordance with normally accepted tax accounting principles and methods consistently applied, in which will be entered fully and accurately each and every transaction of the Company, and (ii) the records required to be maintained by the Company pursuant to the Act. The Company's books and records will be maintained at the Company's principal office or at such other place as the Company may from time to time designate.

(b)      Each Member, after giving reasonable notice of his or her request in writing, has the right of access to and/or the right to inspect at the Company's principal office, at such reasonable times as the Managers may determine, the following records required to be maintained by the Company pursuant to the Act: (i) a current list of the full name and last known business address of each Member in alphabetical order; (ii) a copy of the Company's Articles of Organization and any amendments thereto; (iii) copies of the Company's federal, state and local income tax returns for the 3 most recent years; (iv) copies of this Agreement and any amendments thereto; and (v) of any financial statements of the Company for the 3 most recent years. Within a reasonable time after giving written notice of his or her request to the Company, the requesting Member will have the right, after making prepayment to the Company of the Company's reasonable expenses incurred or to

be incurred in responding to the Member's request, to obtain copies of any records described in this Section 14.02(b) that such Member has the right to inspect.

14.03   **Tax Information**.  The Company will deliver to each Member as soon as practicable after the end of each taxable year the information relating to the Company necessary for the preparation of the Members' federal income tax returns.

14.04   **Tax Matters Partner**.  When there is more than one Member of the Company, the Board of Managers may designate from time to time the "tax matters partner" for purposes of the Code.  The Company may name a substitute or successor at any time.  All decisions with respect to tax matters affecting the Company will require the concurrence of the Board of Managers.

**ARTICLE XV**
**APPOINTMENT OF MANAGERS AS ATTORNEYS-IN-FACT**

15.01   **Appointment of Attorney-In-Fact**.  The Members irrevocably constitute and appoint, with full power of substitution, the Managers of the Company (including but not necessarily limited to the General Manager and/or President), any of whom may act, to be the Company's true and lawful attorneys-in-fact with full power and authority in their or its name, place and stead to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement or the business or affairs of the Company, including but not limited to:

(a)   All instruments, certificates or documents, and any amendments thereto, which may be required to be filed by the Company under the laws of any state or which the Board of Managers deems advisable to file pursuant to the terms of this Agreement;

(b)   Any instrument or document which may be required to effect the continuation of the Company, the admission of a substituted or an additional Member, or the dissolution and termination of the Company, provided that the continuation, admission or dissolution and termination has been approved by the Board of Managers and/or Members, as the case may be, in accordance with the provisions and requirements of this Agreement; and

(c)   Any agreement, instrument, lease, deed, deed of trust, promissory note, certificate or other document in the name or behalf of the Company which is necessary or appropriate to implement, effectuate or otherwise carry out any transaction to which the Company is a party or to which the Company or any of its assets or businesses is or may be subject, provided such transaction has been approved by the Board of Managers or the Members, as the case may be, in accordance with the provisions and requirements of this Agreement.

15.02   **Duration**.  The appointment by each Member of the Managers of the Company as his or her attorneys-in-fact is irrevocable and will be deemed to be a power coupled with an interest and will survive the death, disability, incompetence, Bankruptcy or dissolution of any person giving such power, except, that in the event of a Disposition by a Member of all or any part of his or her Membership Interests, this power of attorney will survive such Disposition only until such time, if any, as the Assignee will have been admitted to the Company as a substituted Member and all

- 19 -

required documents and instruments will have been duly executed, filed and recorded to effect such substitution.

## ARTICLE XVI
## AMENDMENTS

Except as otherwise specifically required by any other provision of this Agreement, this Agreement may be amended or modified only by the vote or the written consent of Members holding at least 85% of the outstanding Percentage Interests entitled to vote; provided, however that no amendment may change a Member's economic rights under this Agreement without that Member's written consent.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

17.01 **Governing Law**. This Agreement and its interpretation, and the rights and liabilities of the parties, including all matters arising out of or relating to this Agreement, whether in tort or in contract, will be governed exclusively by the local, internal law of the State of Maryland.

17.02 **Captions**. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

17.03 **Construction**. Whenever the context may require, any pronouns used herein will include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns will include the plural and *vice versa*. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person.

17.04 **Survival of Representations and Warranties**. All representations and warranties herein will survive until the termination of the Company, except to the extent that a representation or warranty expressly provides otherwise.

17.05 **Severability**. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity will not affect the validity of the remainder of the terms or provisions within this Agreement.

17.06 **Nonwaiver**. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

17.07 **Confidentiality**. No party will, without the express written consent of the Company, either during or after the termination of his or her Membership Interests in the Company, divulge to others any information not already known to the public pertinent to the operations of the Company.

17.08  **Waiver of Partition**.  Each of the parties hereto irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the Company's property or assets.

17.09  **Interests as Personal Property**.  The interests of the Members in all property of the Company will be deemed to be personal property and will pass and may be assigned or otherwise transferred only as such, in accordance with the provisions of this Agreement; provided, however, that in accordance with law, Members may not have their Membership Interests subject to UCC security interests without the express written consent of the Board of Managers or otherwise complying with this Agreement or the Act.

17.10  **Title to Company Property**.  The property of the Company may be held in the Company's name, in the name of the Managers or one or more Managers on behalf of the Company, as the Board of Managers will determine.

17.11  **Execution and Counterparts**.  This Agreement and any amendments may be executed in multiple counterparts, each of which will be deemed an original and all of which together will constitute one agreement.  In addition, this Agreement and any amendments may be executed through the use of counterpart signature pages.  The signature of any party on any counterpart agreement or counterpart signature page will be deemed to be a signature to, and may be appended to, one document.

17.12  **Entire Agreement**.   This Agreement embodies the entire agreement and understanding between the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings between such parties relating to the subject matter hereof.  The parties are not relying on any inducements not otherwise recited herein.  No amendment, modification, termination or waiver of any provision of this Agreement will be effected unless the same is set forth in a writing signed by Members holding the required number of Percentage Interests pursuant to Article XVI.

17.13  **Attorneys' Fees**.  Any party seeking to enforce his or her or its rights hereunder will be entitled, if substantially successful, to recover reasonable attorney's fees and expenses incurred in such enforcement against any party or parties who will have necessitated such enforcement because (a) such party or parties have breached, or attempted to breach, any obligations owing to the enforcing party under the provisions of this Agreement or (b) such party or parties have initiated or joined any claim, demand, arbitration or action against the enforcing party in contravention of, or inconsistent with, the provisions of this Agreement.

17.14  **Addresses**.  Each party will keep the Company informed of his or her or its current address.  The Members will have the addresses furnished by the Members on file at the Company office.

17.15  **Notices**.  Except as otherwise expressly provided in this Agreement, any notice permitted or required hereunder will be in writing and will be deemed given when hand delivered or sent by registered or certified mail to the intended recipient at his or her last known address.  Notice

sent to a Member's address as maintained in the Company's records will be effective with respect to such Member and/or any Assignee of such Member.

17.16 **Additional Documents and Acts**. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

17.17 **Reliance on Authority of Person Signing Agreement**. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Member or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be required to see to the application or distribution proceeds paid or credited to individuals signing this Agreement on behalf of such Member.

17.18 **Independent Counsel**. Each Member warrants and represents that such Member has been advised that such Member should obtain the advice of counsel of such Member's own choosing in the analysis of this Agreement; that such Member has been represented by independent counsel or has had the opportunity to be represented by independent counsel; and that such Member has read this Agreement with care and believes that such Member is fully aware of and understands the contents hereof and their legal effect.

17.19 **Waiver of Jury Trial. EACH MEMBER AND THE COMPANY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, FRAUD OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND/OR THE RELATIONSHIP AMONG THEM.**

17.20 **Burdens and Benefits**. Subject to the limits on transferability contained herein, each and all of the covenants, terms, provisions and agreements herein contained will be binding upon and inure to the benefit of the successors, heirs, and assigns of the respective parties, including but not limited to all Assignees of Members.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE.]

IN WITNESS WHEREOF, the undersigned Members have signed and sealed this Agreement as of the day and year first above written.

_____ (SEAL)
KEVIN D. ASH

_____ (SEAL)
RICHARD E. WARD, II

**MANAGERS AGREED:**

_____ (SEAL)
Kevin D. Ash

_____ (SEAL)
Richard E. Ward, II

#1176578v1  Amended & Restated Operating Agmt EllisDale Construction LLC  51940/00001

- 23 -

# EXHIBIT A

## OWNERSHIP SCHEDULE

| MEMBER | PERCENTAGE INTEREST |
|---|---|
| Kevin D. Ash | 50% |
| Richard E. Ward, II | 50% |
| **TOTAL** | **100%** |

## EXHIBIT B

## DEFINITIONS

The following terms used in the Agreement will (unless otherwise expressly provided in the Agreement or unless the context otherwise requires) have the following respective meanings (and are hereby incorporated by reference into the Agreement:

**Act**. The Maryland Limited Liability Company Act, as amended or superseded from time to time (also sometimes referred to as the Maryland Act).

**Affiliate**. Any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or under common control with, the Person specified. The term "control" (including the terms "controlling," "controlled by," and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or the policies of a Person, whether through the ownership of greater than 50% of the voting securities, by contract or otherwise.

**Agreement**. The Operating Agreement including all Exhibits, as originally executed and as amended from time to time, as the context requires.

**Assignee**. A Person other than a Member who, in accordance with the Maryland Act, succeeds to an ownership interest in all or any portion of a Member's Membership Interests in the Company upon the death, Bankruptcy, dissolution, or other Withdrawal Event with respect to such Member (including the debtor in possession where applicable) or upon another Disposition of such Membership Interests to such Person. The Membership Interest obtained by an Assignee will be no more favorable to the Assignee than the Membership Interest owned by his predecessor, and such Membership Interest will not be relieved of any of its obligations under this Agreement. Therefore, an Assignee will be bound by, and take such Membership Interests subject to, all of the terms and conditions of the Agreement as same applies to Members, but, in accordance with the Maryland Act, an Assignee will not have any votes, consents, inspection rights or any other rights or privileges of a Member (other than those mere assignee rights under Section 4A-603 of the Act described in Section 11.01(b) of the Agreement) unless and until such Assignee is admitted as a substituted Member in accordance with the provisions of Section 11.03 hereof. For example, an Assignee will take Membership Interests subject to any obligations under this Agreement for additional Capital Contributions, cross-indemnification, rights of contribution, transfer restrictions and buy-sell provisions.

**Bankruptcy**. Bankruptcy will mean any of the following:

(a)     The filing of an application by a Person for, or a Person's consent to, the appointment of a trustee, receiver, or custodian of a Person's assets;

(b)     The entry of an order for relief with respect to a Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time;

(c)     The making by a Person of a general assignment for the benefit of creditors;

(d)     The entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Person unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within 90 days;

(e)     The failure by a Person generally to pay his or her debts as they become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, or the admission in writing of the inability to pay his or her debts as they become due; or

(f)     A Person suffering or permitting any of his or her Membership Interests to become subject to the enforcement of any rights of a creditor, whether arising out of an attempt to charge upon that Person's Membership Interests by judicial process or otherwise, if such Person fails to effectuate the release of those enforcement rights, whether by legal process, bonding or otherwise, within 90 days after the actual notice of such creditor's action.

**Business**.  Business will mean the purpose for which the Company is formed as more particularly described in Article III.

**Capital Contribution**.  The total amount of money and/or the agreed upon net fair market value of property or services contributed to the Company by a Member or his or her predecessor in interest on the date of contribution.

**Code**.  The 1986 Internal Revenue Code, as amended from time to time.

**Defaulting Member**.  A Person who fails to pay any amount he or she is required to pay to a Paying Member as indemnification by the due date thereof under Section 4.04 of the Agreement.

**Disability**.  A Member who is employed by the Company is under a Disability if that Member: (1) is under a legal decree of incompetency (the date of such decree being deemed to be the date on which such disability occurred); (2) submits any claim, accepted by the insurance carrier, for disability insurance benefits or for early distribution of any amounts from a qualified pension or profit-sharing plan maintained by the Company; or (3) because of a disease, injury, or other mental or physical impairment that substantially limits a major life activity, is unable to perform the essential functions of his or her position, with or without a reasonable accommodation for at least (or reasonably expected to last at least) 12 months, based on then-available medical information. The date of any written medical determination that is conclusive as to such disability is the date on which such disability will be deemed to have occurred. A medical determination of disability will exist upon the receipt by the Company of the written opinion of a physician who has examined the Member whose disability is in question. If the Company disagrees with the opinion of such physician, it may engage at its own expense another physician to examine the Member. If the physicians do not agree, they will choose a third consulting physician (board-certified in the specialty most closely related to the nature of the disability alleged to exist and the expense of which will be borne by the Company), and the written opinion of a majority of these three (3) physicians will be

conclusive as to such disability. In signing this Agreement, each Member consents to such examination, to furnish any medical information requested by any examining physician, and to waive any applicable physician-patient privilege and HIPAA privacy rights that may arise because of such examination.

**Disposition or Dispose**. The sale, assignment, transfer, exchange, bequest, gift, pledge, encumbrance or other disposition of any Membership Interest(s) in any manner, whether voluntary or involuntary, outright or in trust, or by operation of law (such as upon death, adjudicated incapacity, dissolution, Bankruptcy, Withdrawal Event or in connection with a decree of divorce) or otherwise.

**Distributable Cash**. All cash and funds received from the operation of the Company's Business, other than (1) Capital Contributions, with any interest earned thereon pending its utilization, (2) financing proceeds used in the Company's Business, (3) reserves for working capital, liabilities, and other contingencies, (4) other amounts used to pay or establish reserves for all Company expenses, debt and loan payments, capital improvements, replacements, acquisitions and contingencies, and (5) amounts distributable in, or in anticipation of, liquidation of the Company, all as reasonably determined by the Board of Managers in the efficient conduct of the Company's Business.

**Guaranteed Debt**. This will have the meaning given to such term in Section 4.04.

**Majority in Interest**. In respect of all Members or any specified subgroup thereof, a majority of the Percentage Interests entitled to vote then held by all the Members or the specified subgroup thereof (as in the case of consent of another Member's actions), as the case may be.

**Manager(s)**. The Managers, as a group, will constitute a Board of Managers. Manager(s) means the Person(s) appointed and serving from time to time as a Manager of the Company pursuant to Article VI.

**Members**. The Person(s) whose names are set forth on the Ownership Schedule (a sample is attached as Exhibit A) in each such Person's capacity as a Member of the Company, and any Person admitted as a new Member or a substituted Member under the Agreement.

**Membership Interest**. A Member's entire interest as a Member of the Company, comprised of such Member's economic and financial rights, governance rights and status as a Member of the Company under the Agreement and the Act, together with the obligations of such Member to comply with all of the provisions and requirements of the Agreement and the Act.

**Net Income or Net Loss**. The income or loss, as the case may be, of the Company for a period as determined in accordance with the Code, including each item of income, gain, loss or deduction required to be separately stated.

**Ownership Schedule**. The list of Members and Assignees and their interests as described in Article IV, the initial Ownership Schedule being attached as Exhibit A.

**Paying Member**.  A Member who pays Guaranteed Debt of the Company out of personal funds in the manner and under the circumstances provided in Section 4.04.

**Percentage Interest**.  With respect to any Member or Assignee, the percentage set forth opposite such person's name on the Ownership Schedule, as those percentages may be adjusted from time to time due to transfer of Membership Interests or the admission of additional Members in accordance with the Agreement.

**Person**.  An individual, proprietorship, trust, estate, personal representative, partnership, joint venture, association, company, corporation, or other entity.

**Prime Rate**.  The prime rate (or base rate) reported in the "Money Rates" column or section of *The Wall Street Journal* as being the base rate on corporate loans at larger U.S. Money Center banks on the first date on which *The Wall Street Journal* is published in each month.  In the event *The Wall Street Journal* ceases publication of the Prime Rate, then the "Prime Rate" will mean the "prime rate" or "base rate" announced by the bank with which the Company has its principal banking relationship (whether or not such rate has actually been charged by that bank).  In the event that bank discontinues the practice of announcing that rate, Prime Rate will mean the highest rate charged by that bank on short term, unsecured loans to its most credit worthy large corporate borrowers.

**Property**.  The assets, including all personal and real property, owned by the Company for use in the Business.

**Selling Notice**.  The Notice described in Section 11.02 relating to the Disposition of Membership Interests.

**Withdrawal Event**.  The death, adjudicated incapacity, dissolution, or Bankruptcy of a Member (or Assignee), or Disability of a Member who is employed by the Company that continues for 12 months, or the cessation of employment of a Member who is employed by the Company for any reason or no reason, or any other event of dissociation with respect to a Member (or Assignee) as described in the Act.

**Withdrawing Member**.  A Member (or Assignee) to whom a Withdrawal Event relates.